NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| **JERALD D. ALBRECHT,** | **Civil Action No. 04-1895 (TJB)** |
| **Plaintiff,** | |
| **v.** | **MEMORANDUM OPINION** |
| **ANTHONY WILLIAMS, et al.,** | |
| **Defendants.** | |

**BONGIOVANNI, Magistrate Judge**

This matter comes before the Court upon Plaintiff Jerald Albrecht's ("Albrecht") Motion for Summary Judgement and Defendants Anthony Williams ("Williams") and Michael Stise's ("Stise") (collectively "Defendants") Cross-Motion for Summary Judgment. The Court has fully reviewed and considered all of the papers submitted in support of and in opposition to Albrecht's Motion and Defendants' Cross-Motion, and considers same without oral argument pursuant to FED.R.CIV.P. 78. For the reasons set forth more fully below, Albrecht's Motion for Summary Judgment is DENIED and Defendants' Cross-Motion for Summary Judgment is GRANTED in part and DENIED in part.

## I.    Procedural History

On June 7, 2004, Albrecht filed his Complaint in this matter. Albrecht initiated the instant legal proceedings under 42 U.S.C. § 1983 in order to redress civil rights violations that he allegedly suffered as a result of actions taken by Williams, Stise and Corrections Officer Newborn. Williams responded by filing a motion for summary judgment, based in part on the contention that Williams was entitled to qualified immunity from damages on all of Albrecht's

claims. [Docket Entry No. 13].  On December 6, 2004, the District Court denied without

prejudice Williams' motion for summary judgment. [Docket Entry Nos. 21 and 22].  No answer

or other responsive pleading, however, was filed because the Court granted Albrecht permission

to file an amended complaint that would remove Corrections Officer Newborn as a defendant.

On January 19, 2005, Albrecht filed his Amended Complaint, which named only Williams and

Stise as defendants. [Docket Entry No. 29].  Williams and Stise answered same on January 31,

2005. [Docket Entry No. 30].  On July 21, 2006, Albrecht filed a Second Amended Complaint.

[Docket Entry No. 62].  To date, neither Williams nor Stise has answered that Complaint.

On October 23, 2008, Albrecht filed the instant Motion for Summary Judgment. [Docket

Entry No. 114].  On December 15, 2008, Defendants opposed Albrecht's Motion and also cross-

moved for summary judgment. [Docket Entry Nos. 119 and 120].  The briefing schedule for

Albrecht's Motion and Defendants' Cross-Motion was altered several times due to Albrecht's

complaints that he was not receiving legal mail.  On April 9, 2009, Albrecht filed a response in

opposition to Defendants' Cross-Motion and a reply in further support of his Motion for

Summary Judgment.  [Docket Entry No. 127].

## II.    Background

Albrecht's claims against Williams stem primarily from an incident that occurred on

April 27, 2003.  Albrecht is a Roman Catholic, who, due to his religious beliefs, abstains from

working on Sundays.  (Pl.'s L.Civ.R. 56.1 Statement at ¶ 4; Def.'s L.Civ.R. 56.1 Statement at ¶

2).  In August 2001, Albrecht accepted a position as a second shift shower runner, which is

typically a seven-day-a-week job.  (Pl.'s L.Civ.R. 56.1 Statement at ¶ 6; Def.'s L.Civ.R. 56.1

Statement at ¶ 3).  Prior to accepting the position, however, Albrecht claims that he informed his

2

supervisor of his religious beliefs and obtained an accommodation not to work on Sundays.

(Pl.'s L.Civ.R. 56.1 Statement at ¶ 6).  Thus, since obtaining the position in August 2001,

Albrecht worked only six days a week and was excused from working on Sundays.  (Pl.'s

L.Civ.R. 56.1 Statement at ¶ 8).  This arrangement continued without incident for over 18

months until April 27, 2003.

On Sunday, April 27, 2003, Albrecht was approached by Williams.  (Def.'s L.Civ.R. 56.1

Statement at ¶ 5; Pl.'s L.Civ.R. 56.1 Counter-Statement at ¶ 5).  Albrecht and Williams disagree

over whether Albrecht was asked to work the first shift unit cleanup because the individuals

assigned to complete that task had refused to work (Pl.'s L.Civ.R. 56.1 Statement at ¶ 10) or

whether he was asked "to clean the showers because the first shift shower runners refused to

work."  (Def.'s L.Civ.R. 56.1 Statement at ¶ 6).  Regardless of which task he was asked to work,

Albrecht declined, informing Williams that his religious beliefs obligated him to abstain from

working on Sundays.  (Pl.'s L.Civ.R. 56.1 Statement at ¶ 12; Def.'s L.Civ.R. 56.1 Statement at ¶

6).  Albrecht claims that Williams responded by stating that "I don't care about your Sabbath."

(Pl.'s L.Civ.R. 56.1 Statement at ¶ 13; Albrecht's Moving Br. at 7).  Williams does not deny that

he made such a statement.  Albrecht also claims that none of the individuals assigned to work

first shift unit cleanup were disciplined for their refusal to work.  (Pl.'s L.Civ.R. 56.1 Statement

at ¶ 17).  Williams similarly does not deny this allegation.

In response to Albrecht's refusal to work, Williams issued disciplinary charges against

him.  (Pl.'s L.Civ.R. 56.1 Statement at ¶ 16; Def.'s L.Civ.R. 56.1 Statement at ¶ 7).  Williams

argues that while initially Albrecht received inmate disciplinary charges pursuant to N.J.A.C.

10:A4-4.1 (a) .254 and .256, these charges were ultimately downgraded to an on-the-spot charge,

which Williams describes as being "minor in nature." (Def.'s L.Civ.R. 56.1 Statement at ¶ 7; Def. Opp. Br. at 1). Albrecht, however, specifically denies that the charges were downgraded and claims that he "never received an on-the-spot charge." (Pl.'s L.Civ.R. 56.1 Counter-Statement at ¶ 7). As a result of the aforementioned occurrences, Albrecht also lost his job as a second shift shower runner. (Pl.'s L.Civ.R. 56.1 Counter-Statement at ¶ 7). Since losing same, Albrecht has not sought to obtain a new job, but instead filed this lawsuit through which he, in part, seeks the restoration of his previous job.[1] (Def.'s L.Civ.R. 56.1 Statement at ¶ 8; Pl.'s L.Civ.R. 56.1 Counter-Statement at ¶ 8).

Albrecht claims that Williams violated his right to free expression under both the First Amendment and the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc-1(a)(1)(A)-(B), when he issued disciplinary charges against Albrecht for refusing to work the first shift unit cleanup detail on Sunday, April 27, 2003. Albecht also claims that his Fourteenth Amendment equal protection rights were violated by the Department of Corrections' ("DOC") policy of recognizing work proscriptions "for Jews, Muslims, and Seven Day Adventists, but not for Catholics." (Pl.'s Moving Br. at 11).

In addition, Albrecht alleges that Williams impermissibly retaliated against him when Williams issued disciplinary charges against him after he engaged in the constitutionally protected activity of abstaining from work on Sundays. Albrecht further claims that Williams' retaliatory actions continued after Albrecht exercised his right to appeal the disciplinary charges levied against him, wrote a letter to the prison's administrator complaining about Williams,

---

[1]The Court notes that Albrecht is no longer imprisoned and therefore his request to have his job restored has been rendered moot.

submitted grievances complaining about Williams' on-going retaliation and filed the instant

lawsuit against Williams.  Specifically, Albrecht argues that Williams engaged in the following

series of retaliatory behavior: Williams deprived Albrecht of visits, denied him access to medical

and dental care, deprived Albrecht of the right to worship, denied him access to legal reference

materials and interfered with his outgoing legal mail.  (Pl.'s L.Civ.R. 56.1 Statement at ¶ 26).

Based on the above-described alleged violations of his federal rights, Albrecht seeks

compensatory and punitive damages as well as declaratory and injunctive relief.

In addition, Albrecht has brought suit against Williams on several state law claims.  For

example, Albrecht alleges that Williams violated New Jersey's Law Against Discrimination

("LAD"), N.J.S.A. 10:5-4, when he issued disciplinary charges against Albrecht based on

Albrecht's refusal to work on Sunday, April 27, 2003.  In this regard, Albrecht claims that "[t]he

DOC's policy of recognizing work proscriptions for Jew, Muslims, and Seven Day Adventists,

but not for Catholics, is repugnant to Catholic Cannon Law, is not a condition or limitation

applicable alike to all persons, and is discriminatory."  (Pl.'s Br. at 29).  Albrecht also claims that

Williams, through his course of retaliation against Albrecht, harassed him.  Similarly, Albrecht

alleges that Williams' pattern of harassment and retaliation resulted in both the intentional and

negligent infliction of emotional distress.  Albrecht additionally claims that Williams assaulted

and battered him by threatening him verbally and by physically shoving him.  Further, Albrecht

claims that Williams fraudulently concealed or destroyed the following evidence:

> (1) records of the disciplinary hearing and on-the-spot consent, (2)
> visit registration records, (3) G-81 Traffic Control journal entries,
> (4) Traffic Control Log entries, (5) G-86 Wing Officer's Traffic
> Log, (6) unit search log records, (7) records and investigative
> reports relating to the meeting between plaintiff's father, the

5

> attorney, Superintendent Tyler, and Executive Assistant Troy, and
> (8) plaintiff's mental health records.

(*Id*. at 34; *see* Pl.'s L.Civ.R. 56.1 Statement at ¶ 55).

Finally, Albrecht claims that like Williams, Stise also impermissibly retaliated against him.  Specifically, Albrecht alleges that in retaliation for verbally complaining to Stise about not being allowed to attend a set-up for the weekly Catholic Mass and requesting that Stise provide him with a grievance form so that Albrecht could file a complaint regarding same, Stise conducted a "destructive . . . search" of his cell.  (Pl.'s Br. at 18).  Albrecht now seeks summary judgment on the aforementioned claims.

Williams and Stise deny that they violated any of Albrecht's rights, and not only oppose Albrecht's Motion for Summary Judgment, but have also cross-moved, claiming that summary judgment should be granted in their favor.  In addition to arguing that Albrecht cannot establish any of the alleged violations outlined above, Williams and Stise also contend that they are entitled to qualified immunity with respect to Albrecht's federal claims.[2]

_____

[2]Pursuant to L.Civ.R. 56.1, a party moving for summary judgment must "furnish a statement which sets forth material facts as to which there does not exist a genuine issue, in separately numbered paragraphs citing to the affidavits and other documents submitted in support of the motion."  If a "motion for summary judgment" is "unaccompanied by a statement of material facts not in dispute[,]" then the Court must dismiss the motion.  *Id*.  Further, a party opposing the summary judgment motion must "furnish, with its opposition papers, a responsive statement of material facts, addressing each paragraph of the movant's statement, indicating agreement or disagreement and, if not agreed, stating each material fact in dispute and citing to the affidavits and other documents submitted in connection with the motion; any material fact not disputed shall be deemed undisputed for purposes of the summary judgment motion."  *Id*.

Here, Albrecht properly filed a 65-paragraph L.Civ.R. 56.1 Statement, with citations to the record, in connection with the instant motion for summary judgment.  Despite their obligation to do so, Defendants failed to file a responsive statement.  Instead, in support of their cross-motion for summary judgment, Defendants filed an 11-paragraph L.Civ.R. 56.1 Statement to which Albrecht properly responded.  Given Defendants failure to file a responsive statement of material facts, the Court must treat the facts outlined by Albrecht in his L.Civ.R. 56.1 Statement

## III.   Discussion

### A.   Standard of Review

A party seeking summary judgment must "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED.R.CIV.P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Hersh v. Allen Prod. Co.*, 789 F.2d 230, 232 (3d Cir. 1986).  The threshold inquiry is whether there are "any genuine factual issues that properly can be resolved only be a finder of fact because they may reasonably be resolved in favor of either party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (noting that absent sufficient evidence favoring nonmoving party for jury verdict in its favor, no issue for trial exists).  In determining whether triable issues of fact exist, the Court must view the underlying facts and draw all reasonable inferences in favor of the non-moving party.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Pa Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir. 1995).

### B.   Federal Claims

Because supplemental jurisdiction over claims based on state law "should be declined where the federal claims are no longer viable," the Court first addresses the viability of Albrecht's claims involving federal questions, namely his First Amendment free expression,

---

as undisputed (the Court has construed Defendants 11-paragraph statement of material facts as their response to Albrecht's 65-paragraph statement; however, even giving Defendants the benefit of this liberal construction, nearly all of the facts outlined by Albrecht remain undisputed).  As such, Defendants' repeated assertion that Albrecht has set forth no evidence in support of his allegations is nullified.  Indeed, treating the facts outlined by Albrecht in his L.Civ.R. 56.1 Statement as undisputed, Albrecht has set forth significant evidence in support of his claims; certainly enough to survive Defendants' cross-motion for summary judgment.

RLUIPA, Fourteenth Amendment equal protection and First Amendment retaliation claims. *Shaffer v. Albert Gallatin Area Sch. Dist.*, 730 F.2d 910, 912 (3d Cir. 1984). Furthermore, because Williams and Stise both contend that they are entitled to a qualified immunity defense with respect to Albrecht's federal claims and because "the question of whether a plaintiff has adequately alleged a constitutional violation is subsumed within the immunity analysis," the following discussion addresses: (1) whether Albrecht has established viable constitutional claims; (2) whether, absent a qualified immunity defense, Albrecht would be entitled to summary judgment on his constitutional claims; and (3) whether Williams and Stise are immune from suit. *R.K. v. Y.A.L.E. Schools, Inc.*, Civil No. 07-5918 (JBS), 2008 WL 4792673, at *4 (D.N.J. Oct. 30, 2008).

As an "accommodation of competing values," qualified immunity strikes a balance by allowing a plaintiff to recover for constitutional violations where the government officer was "plainly incompetent or . . . knowingly violate[d] the law," while immunizing an officer who "made a reasonable mistake about the legal constraints on his actions." *Curley v. Klem*, 499 F.3d 199, 206-07 (3d Cir. 2007) (internal quotations and citations omitted). In *Saucier v. Katz*, the Supreme Court set forth the two-step inquiry that courts undertake in determining whether a government officer is entitled to qualified immunity. 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). First, the Court must determine whether "the officer's conduct violated a constitutional right." *Id*. at 201. If the Court finds that there was no constitutional violation, then "there is no necessity for further inquiries concerning qualified immunity." *Id*. However, if the Court finds that a plaintiff's constitutional rights were violated, then "the court moves to the second step of the analysis and asks whether immunity should nevertheless shield the officer

8

from liability." *Curley*, 499 F.3d at 207.  Under the second prong of the analysis, the Court addresses "whether the right that was violated was clearly established, or, in other words, 'whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *Id.* (quoting *Saucier*, 533 U.S. at 202).[3]

As described more fully below, Williams and Stise argue that they are entitled to qualified immunity because Albrecht cannot establish that they violated his constitutional rights. Further, they argue that even if the Court were to determine that a constitutional violation occurred, Williams and Stise's conduct was "objectively reasonable in light of the 'clearly established' law."  (Def.'s Opp'n Br. at 25 (citation omitted)).

Albrecht argues that Defendants are not entitled to a qualified immunity defense.  In this regard, Albrecht first claims that Defendants waived their right to assert a qualified immunity defense when they failed to timely answer his Second Amended Complaint.  Indeed, Albrecht notes that he filed his Second Amended Complaint on July 21, 2006 and, despite the fact that according to FED.R.CIV.P. 15(a) Defendants' responsive pleading had to be filed within 10 days thereof, to date no answer has been filed.  In addition, Albrecht argues that even if the Court finds that Defendants did not waive their right to assert qualified immunity, Defendants would nevertheless not be entitled to such a defense because Albrecht has not only established that Defendants violated his constitutional rights, but has also shown that a prisoner's right to

_____

[3]The Court notes that in January 2009, the Supreme Court reexamined the two-step inquiry set forth in *Saucier* and relaxed the protocol for engaging in same.  *Pearson v. Callahan*, ---U.S. ---, 129 S.Ct. 808, 172, L.Ed.2d 565 (2009).  Thus courts may now, in their discretion, begin their analysis with the second step of the inquiry.  *Id.* at 819.  Here, however, the Court shall begin with the first-step and determine whether Williams and Stise violated Albrecht's constitutional rights.

exercise religion and to be free from discriminatory punishment because of his religious beliefs are clearly established.

The Court first addresses Albrecht's waiver argument.  While Defendants' inexplicable failure to respond to Albrecht's Second Amended Complaint is troubling, the Court shall not preclude Defendants from asserting a qualified immunity defense on that ground.  Despite the more than two and a half year delay, the Court finds that Albrecht will not be prejudiced if Defendants are permitted to assert a qualified immunity defense.  *See Inox Wares Pvt. Ltd. v. Interchange Bank*, Civil Action No. 06-4307 (SRC), 2008 WL 4691906, at *9 (D.N.J. Oct. 22, 2008) (permitting party to file amended answer where plaintiff would not be prejudiced by defendant's oversight to timely file same).  In this regard, the Court notes that Defendants raised qualified immunity both in their motion for summary judgment filed in response to Albrecht's initial Complaint and as an affirmative defense in their Answer to Albrecht's First Amended Complaint.  Further, Defendants have continued to actively defend this matter since Albrecht's Second Amended Complaint was filed.  As a result, the Court finds that Defendants have not waived their qualified immunity defense.

Having determined that Williams and Stise have not waived their qualified immunity defense, the Court turns to whether as a matter of law either should be immunized from suit with respect to any of Albrecht's federal claims.

### 1.    Albrecht's First Amendment Free Expression Claim Against Williams

Albrecht claims that he is entitled to summary judgment on his First Amendment free expression claim against Williams because under *Turner v. Safley*, 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987), it was unreasonable (given Albrecht's religious belief that he must abstain

10

from engaging in servile work on Sundays) for Williams to discipline him when he refused to work the first shift unit cleanup detail on Sunday, April 27, 2003.  Williams cross-moves for summary judgment arguing that under *Turner* his actions did not violate Albrecht's First Amendment rights because Williams' decision to discipline Albrecht after he refused to work was reasonable.

In *Turner*, the Supreme Court held that a prison regulation that impinged on an inmate's constitutional rights is nevertheless valid if it is "reasonably related to legitimate penological interests."  482 U.S. at 89.  The Supreme Court also set forth four factors to consider in determining the reasonableness of the regulation, and, consequently, the prison administrator's action, at issue.  Specifically, the Court must consider (1) whether there is a "'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it" (*Id.* (quoting *Block v. Rutherford*, 468 U.S. 576, 586, 104 S.Ct. 3227, 82 L.Ed.2d 438 (1984))); (2) "whether there are alternative means of exercising the right that remain open to prison inmates" (*Id.* at 90); (3) "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally" (*Id.*); and (4) whether alternatives exist to the regulation.  *Id.*

Here, Albrecht argues that Williams cannot simply claim that he was enforcing a work regulation because Albrecht had already obtained an accommodation to be excused from working on Sundays before he accepted his job as a second shift shower runner and because he was neither assigned to work on Williams' shift, nor was he assigned to work unit cleanup detail.  In addition, with respect to the *Turner* factors, Albrecht claims that it was irrational for Williams to discipline him for refusing to work the first shift unit cleanup detail because he was never

11

assigned to work that job.  In this respect, Albrecht argues that "[a]n order to work an unassigned job on an unassigned shift is both arbitrary and capricious and is for, that reason, the very antithesis of <u>Turner</u>'s standard[.]" (Pl's Br. at 6).  Indeed, Albrecht contends that "allowing prison officials to order prisoners to work unassigned jobs would create chaos and disorder and actually jeopardize the safe, secure, and orderly operation of the prison."  (*Id*.)  Thus, Albrecht argues that while the prison's "work regulation, and the governmental interest in enforcing prison discipline, is valid and rational on its face, its application to plaintiff did not serve a valid, rational or legitimate penological objective" because "Williams lacked authority to order plaintiff to work an unassigned job, on an unassigned shift[.]" (Pl's Reply Br. at 10).

Furthermore, Albrecht claims that there is no reason to search for alternative means by which Albrecht can exercise his right because his "practice of abstaining from work on the Sabbath was fully accommodated by his work supervisor."  (*Id*. at 11).  Albrecht also contends that the third *Turner* factor weighs heavily in his favor because prior to April 27, 2003, the prison had accommodated his religious belief and allowed him to abstain from working on the Sabbath for 18 months without incident.  Further, Albrecht alleges that the DOC recognizes work proscriptions for other religions such as "Muslims, Jews and Seven Day Adventists" and therefore it "would be hard to put forth any non-discriminatory reason for not recognizing a work proscription which, at least for Catholics, has been enshrined in church doctrine from the very beginning, and has historical antecedents which can be tied directly to the Jewish Sabbath work proscription."  (*Id*. at 11-12).  In addition, Albrecht claims that an easy alternative to the situation presented would have been for Williams to have "laid plaintiff in from his job without instituting punitive measures."  (Pl's Br. at 7).

In contrast, Williams argues that his actions were reasonable and that under *Turner*, summary judgment should be granted in his favor on Albrecht's First Amendment freedom of expression claim.  Specifically, Williams argues that a rational connection exists between the prison's policy of not allowing inmates to refuse work assignments at their discretion and its interest in maintaining order and discipline in the prison.  Indeed, Williams notes that the Supreme Court has already determined that allowing inmates to use their discretion to determine when they will work is disruptive to the order and safety of the prison and consumes prison resources.  *See O'Lone v. Estate of Shabazz*, 482 U.S. 342, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987) (upholding prison policy prohibiting inmates assigned to outside jobs from returning to institution to attend prayer); *Bell v. Wolfish*, 441 U.S. 520, 546, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979).  Williams also argues that Albrecht had other means of exercising his right, noting that Albrecht was permitted to engage in bible study, attend mass and participate in mass set up and music.  Williams also points out that outside of the April 27, 2003 incident, Albrecht was never required to work on Sundays.  Further, Williams argues that it is possible that Albrecht's rights could have been accommodated through a five-day-a-week job; however, Albrecht never attempted to obtain a job after being "removed from his position as a shower runner." (Def.'s Br. at 17).

The Court finds that genuine issues of material facts prevent summary judgment being granted in either Albrecht or Williams' favor.  For example, the parties dispute whether Albrecht was asked to work an unassigned job.  Albrecht argues that despite accepting a job as a second shift shower runner, he was ordered to complete the first shift unit cleanup detail.  Further, Albrecht claims that despite Williams' statement to the contrary, he was not simply asked to

13

"clean the showers," but instead was ordered to work first shift unit cleanup detail.  (Pl.'s Reply Br. at 2).  Albrecht claims that "[t]hese jobs are not the same, involve different duties, different work areas, different work supervisors, and different work times."  (*Id.*)  In contrast, Williams claims that he asked Albrecht to "clean the showers" after the first shift shower runners refused to work.  (Def.'s Br. at 1).  Williams further argues that while Albrecht "was assigned to the second shift, he had no set work hours."  (*Id.* at 13).  Williams claims that Albrecht's refusal "to complete his assigned work task" was "a violation of the inmate disciplinary rules" and therefore it was appropriate for Williams to discipline Albrecht.  (*Id.*)

As is clear, the parties dispute whether Albrecht was ordered to work the first shift unit cleanup detail, as alleged by Albrecht, or whether he was ordered to clean the showers, as Williams claims.  While significant deference is given to prison authorities in their running of prisons, that deference is not unlimited.  Inmates are not required to accept prison jobs, but instead do so voluntarily.  Here, Albrecht accepted a job as a second shift shower runner.  Even if the Court were to agree with Williams and find that there is a legitimate penological interest in requiring inmates to complete their job assignments as required by the needs of the institution, and even if the Court were to find that, since Albrecht had no set work hours, the fact that Albrecht was asked to work the first shift rather than the second shift to which he was assigned did not undermine the alleged reasonable relationship between Williams' conduct and the aforementioned legitimate penolgoical interest, the Court would nevertheless find that Williams' conduct was irrational if he in fact disciplined Albrecht for refusing to complete a job to which Albrecht was never assigned.  Thus, the resolution of this dispute (i.e. whether Albrecht was asked to "clean the showers" or work first shift unit cleanup) plainly impacts the analysis of

14

whether Williams violated Albrecht's First Amendment freedom of expression rights under
*Turner*.  Consequently, it would be inappropriate to grant summary judgment on this issue in
either Albrecht or Williams' favor.

As a result, with respect to the qualified immunity analysis, the Court finds that Albrecht
has set forth a viable claim that Williams' conduct violated his freedom of expression rights
under the First Amendment.  The Court therefore next turns to whether Williams should
nevertheless be shielded from liability.  As previously stated, in undertaking this analysis the
Court addresses "whether the right that was violated was clearly established, or, in other words,
'whether it would be clear to a reasonable officer that his conduct was unlawful in the situation
he confronted.'" *Curly*, 499 F.3d at 207 (quoting *Saucier*, 533 U.S. at 202).

As an initial matter, the Court must first define what right is at issue, as the parties'
characterizations of the right differ significantly.  Albrecht argues that the rights that were
violated were his "right to exercise [his] religion" as well as his right "to be free from
discriminatory punishment because of his religious beliefs."  (Pl.'s Reply Br. at 24).  Albrecht
further argues that both of these rights are clearly established.  Williams, however, appears to
claim that the right at issue was Albrecht's "ability to make 'arrangements' with officers to
modify [his] work schedule so as to work only six days of a seven-day job."  (Def.'s Br. at 26).
Williams argues that no decision from any Court in New Jersey establishes that Albrecht had a
right to make such an arrangement.  Instead, Williams alleges that "Albrecht was assigned to
work seven days a week, without any fixed working hours" and that "[u]nder that rubric, when
Albrecht refused to work, he apparently violated prison rules."  (*Id*. at 27).  Therefore, Williams
argues that "disciplining Albrecht was objectively reasonable under the circumstances."  (*Id*.)

15

The Court believes that Williams' proposed definition is far too narrow.  At issue is not the arrangement Albrecht made prior to accepting his job as a second shift shower runner, but instead is Albrecht's right to exercise his religious beliefs and keep the Sabbath holy.  The right to freely exercise one's religious beliefs has been clearly established for decades.  *See Cruz v. Beto*, 405 U.S. 319, 322, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972) (holding that inmate cannot be denied reasonable opportunity of pursuing his faith).  Moreover, even if the Court were to more narrowly define the right at issue as the right to abstain from servile work on the Sabbath, which might call into question the conclusion that the right has been clearly established, the Court would nevertheless conclude that, at this juncture, Williams is not entitled to qualified immunity with respect to Albrecht's First Amendment freedom of expression claim.

The Court acknowledges that whether a governmental official is entitled to qualified immunity is a matter of law to be decided by the Court and not a jury.  *See Hunter v. Bryant*, 502 U.S. 224, 228. 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) (*per curium*).  This case, however, presents a novel question: is a prison official, who would otherwise be immune from suit, entitled to qualified immunity where he has disciplined an inmate for refusing to work a job to which he was never assigned.  The Court answers that question in the negative.  Indeed, as a matter of law, the Court finds that it would be clear to a reasonable officer that disciplining an inmate who refused to work a job to which the inmate was never assigned would be unlawful.  Consequently, the Court finds that, regardless of how well established the right in question was, such an officer would not be entitled to qualified immunity.  Thus here, the Court finds that even if the right at issue was not clearly established at the time of the incident, if Williams disciplined Albrecht for refusing to work a job to which Albrecht was never assigned, then Williams would

16

not be entitled to qualified immunity.  As a result, even if the Court defined the right at issue more narrowly, the Court would nevertheless find that Williams is not entitled to qualified immunity at this time because the fact question of whether Williams disciplined Albrecht for refusing to work a job to which he was not assigned must be first resolved.

### 2.     Albrecht's RLUIPA Claim Against Williams

Pursuant to RLUIPA, "[n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution, . . . unless the government demonstrates that imposition of the burden on that person-- (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest."  42 U.S.C. § 2000cc-1(a).  As an initial matter, in order for an inmate to prevail on a RLUIPA claim, the inmate must establish that he possesses a sincerely held, authentic religious belief, the exercise of which the government has substantially burdened.  *See Cutter v. Wilkinson*, 544 U.S. 709, 725 n. 13, 125 S.Ct. 2113, 161 L.Ed.2d 1020 (2005).  In this regard, while "RLUIPA bars inquiry into whether a particular belief or practice is 'central' to a prisoner's religion, see 42 U.S.C. § 2000cc-5(7)(A), the Act does not preclude inquiry into the sincerity of a prisoner's professed religiosity."  *Id*.  Further, under RLUIPA, a substantial burden exists where "1) a follower is forced to choose between following the precepts of his religion and forfeiting benefits otherwise generally available to other inmates versus abandoning one of the precepts of his religion in order to receive a benefit; OR 2) the government puts substantial pressure on an adherent to substantially modify his behavior and to violate his beliefs." *Washington v. Klem*, 497 F.3d 272, 280 (3d Cir. 2007).

If the inmate proves that the government substantially burdened the exercise of a

sincerely held religious belief, then the burden shifts and the Court must determine whether the

government has demonstrated that the burden was both imposed in furtherance of a compelling

government interest and represents the least restrictive means of furthering that compelling

government interest.  *See Washington v. Klem*, 497 F.3d at 282.  In undertaking this analysis, the

Court is mindful of the fact that "'context matters'" (*Cutter*, 544 U.S. at 723 (quoting *Grutter v.*

*Bollinger*, 539 U.S. 306, 327, 123 S.Ct. 2325, 156 L.Ed.2d 304 (2003)) and gives "'due

deference to the experience and expertise of prison and jail administrators in establishing

necessary regulations and procedures to maintain good order, security and discipline, consistent

with consideration of costs and limited resources.'" *Id*. (quoting S.Rep. No. 103-111, at 10, U.S.

Code Cong. & Admin. News 1993, pp. 1892, 1899, 1900).

Here, while Williams' argues that "Albrecht's beliefs may not be religious in nature[,] but

instead may be "personal to him" (Def.'s Br. at 11), there is clear factual support in the record for

Albrecht's contention that the obligation to abstain from servile work on Sundays is a sincerely

held religious belief.  For example, Albrecht has established that abstaining from servile work on

the Sabbath is a Catholic belief and practice that dates back to at least 306 A.D.  (Pl.'s Br. at 10).

Further, Albrecht has set forth sufficient evidence for a reasonable jury to find that he sincerely

holds this religious belief.  Indeed, from the record, it appears that Albrecht has abstained from

all servile work on Sundays since December 4, 1994.  (Pl.'s L.Civ.R. 56.1 Statement at ¶ 4).  In

addition, rather than violate his religious belief, on Sunday, April 27, 2003, Albrecht, after

professing his beliefs to Williams, refused to work.  (*Id*. at ¶¶ 12 and 14).  Based on these facts,

in the context of the parties' motions for summary judgment on Albrecht's RLUIPA claim,

18

Albrecht has met his burden of establishing that abstaining from servile work on Sundays is a sincerely held religious belief.

The Court also finds that Albrecht has established that his religious exercise was substantially burdened when he was disciplined for refusing to work on Sunday, April 27, 2003. The Court is unpersuaded by Williams' argument that "[b]eing asked on a single occasion to work on a Sunday is not sufficient to establish a 'substantial burden' on religious exercise, especially given that Albrecht admits that the burden on him would have been only an hour." (*Id*. at 13). In this regard, the Court finds that Albrecht's religious exercise was substantially burdened because Albrecht was forced to choose between adhering to his religious belief of abstaining from servile work on Sundays or forfeiting the ability to perform a seven-day-a-week job. Indeed, when Albrecht refused to work, he was not only issued a disciplinary charge but he also lost his job. The fact that Albrecht lost his job supports a finding that his religious exercise was substantially burdened. Indeed, the Court finds that the threat of losing one's job places substantial pressure on the job-holder to modify his behavior and violate his beliefs by completing the work assignment as instructed.

Having determined that the record supports a finding that Albrecht possessed a sincerely held religious belief the exercise of which Williams substantially burdened, the Court next turns to whether Williams has established that the burden imposed on Albrecht was in furtherance of a compelling government interest and represents the least restrictive means of furthering same. While the Court agrees with Williams that the need to maintain order, safety, security and discipline in a prison represents a compelling government interest that could justify the imposition of a substantial burden on an inmate's religious exercise, the Court also agrees with

19

Albrecht that no compelling government interest exists in ordering an inmate to work an unassigned job.  As previously explained, a genuine factual issue exists with respect to whether Albrecht was ordered to work a job to which he was not assigned.  That fact issue is also relevant to the determination of whether Albrecht's religious exercise was substantially burdened in furtherance of a compelling government interest.  If a jury determines that Williams ordered Albrecht to work his assigned job and Albrecht refused, then the burden imposed on Albrecht's religious exercise would have been in furtherance of the government's compelling interest in maintaining order, safety, security and discipline in the institution; indeed, the Court agrees with Williams that "allowing inmates to pick and choose when they will work is disruptive to the prison, consumes staff resources, and leads to jealousy and strife between inmates."  (*Id*. at 16).  However, if a jury determines that Williams ordered Albrecht to work a job to which he was never assigned and Albrecht refused, then the burden imposed on Albrecht's religious exercise would not have been in furtherance of a compelling government interest because the government has no compelling interest in ordering inmates to work unassigned jobs.  Indeed, the Court finds that doing so would not only fail to promote order, safety, security or discipline within the prison, but would actually undermine those interests.

Moreover, even had the Court determined that the burden imposed on Albrecht's religious exercise furthered a compelling government interest, summary judgment would nevertheless be inappropriate because it is not clear that disciplining Albrecht was the least restrictive means of furthering the compelling government interest.  While the Court gives due deference to the experience and expertise of prison administrators in establishing regulations and policies necessary "to maintain good order, security and discipline, consistent with consideration

20

of costs and limited resources[,]" the Court finds that there is ample evidence in the record to support a finding that the discipline meted out to Albrecht did not represent the least restrictive alternative of furthering the prison's compelling interests. *Cutter*, 544 U.S. at 723 (internal quotation marks and citations omitted).  Indeed, not accounting for other possible alternatives, the record clearly establishes that for approximately 18 months the prison successfully accommodated Albrecht's religious beliefs without disrupting the prison's order, safety or security and without imposing a substantial cost on the prison.

As a result, the Court finds that genuine factual issues prevent it from granting summary judgment in either Albrecht or Williams' favor on Albrecht's RLUIPA claim.  Therefore, the Court finds that Albrecht has set forth a viable RLUIPA claim.  Furthermore, for the reasons set forth in Section III, B, 1 of this Opinion, the Court finds that Williams is not entitled to qualified immunity at this time.

### 3.   Albrecht's Fourteenth Amendment Equal Protection Claim Against Williams

Albrecht claims that he was discriminated against in violation of the Fourteenth Amendment's Equal Protection Clause because he, as a practicing Catholic, was denied the right to abstain from work on the Sabbath, while the DOC recognizes work proscriptions for Jews, Muslims and Seven Day Adventists.  (Albrecht's L.Civ.R. 56.1 Statement of Material Facts ¶ 3; Albrecht Decl. ¶ 17; Albrecht's Appendix I at 69-72).  To prevail on an equal protection claim, Albrecht must present evidence that he was treated differently than similarly situated persons. *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985); *Williams v. Morton*, 343 F.3d 212, *221 (3d Cir. 2003).  Further, "*Turner* is equally

applicable to Prisoners' equal protection claims." *Williams*, 343 F.3d at 221 (citing *DeHart v. Horn*, 227 F.3d 47, 61 (3d Cir. 2000)).

The Court finds that Albrecht has presented sufficient evidence to proceed with his equal protection claim.  In supporting his claim, Albrecht points to DOC policies that recognize work proscriptions for adherents to other religions, but not for Catholics.  (*See* Pl.'s App. I at 69-72).  Williams does not deny that such policies exist.  Instead, Williams insists that Catholic prisoners are not treated differently from other inmates because like other inmates they are excused from work to attend religious services.  Indeed, Williams argues that while "Albrecht claims that Catholic inmates were not permitted to refrain from work on Sunday, as their religion requires[,] . . . in his deposition, Albrecht testified to the exact opposite - that Catholic inmates were permitted to leave work and attend services." (Def.'s Br. at 20).  Williams' argument, however, misses the mark.  Albrecht's equal protection claim is not based on an argument that Catholics were not permitted to attend religious services like other groups.  Instead, Albrecht argues that Catholics, unlike other religious groups, are denied work proscriptions.

If, as Albrecht alleges, DOC policies recognize work proscriptions for religious groups like Jews, Muslims and Seven Day Adventists, but not for Catholics, then, pursuant to those policies, Catholic inmates like Albrecht are being treated differently than similarly situated persons.  Further, a review of the DOC's Internal Management Procedures establishes that the DOC's Guidelines for Religious Practices specifically recognize Sabbath work proscriptions for Jewish and Seventh Day Adventist inmates.  (Pl.'s App. I at 69 & 71).  The guidelines also specifically state that inmates of the Roman Catholic faith have no work proscriptions.  (*Id.* at

72).  As a result, the Court finds that Albrecht has established that he was treated differently than similarly situated persons.

However, given Albrecht's confinement, the Court's inquiry does not stop there.  Instead, the Court must next determine whether under *Turner* the disparate treatment between Albrecht, an inmate with a sincerely held, albeit unrecognized by the DOC, religious belief requiring him to abstain from work on the Sabbath, and inmates for whom the DOC recognizes Sabbath work proscriptions is "'reasonably related to legitimate penological interests.'" *DeHart*, 227 F.3d at 61 (quoting *Clark v. Groose*, 36 F.3d 770, 773 (8th Cir. 1994)).

Here, Williams has failed to establish that the disparate treatment is reasonably related to any such interest.  In fact, given Williams' insistence that "there has been no difference in treatment between Catholics and other religions[,]"  Williams does not even attempt to provide such an explanation.  (Def.'s Br. at 20).  As such, Williams has not shown that the differential treatment is reasonably grounded in legitimate penological interests.  Furthermore, while such a nexus may exist, the connection between the disparate treatment and a legitimate penological interest is not self evident.  Nevertheless, drawing all reasonable inferences in Williams' favor, the Court finds that further development of this issue is needed and therefore that summary judgment is not warranted at this time.

Thus, having determined that Albrecht has a viable equal protection claim, the Court turns next to whether Williams should nevertheless be immune from suit.  In order to avoid the effects of qualified immunity, Albrecht must prove that Williams had reason to know that he was violating Albrecht's clearly established equal protection rights by disciplining Albrecht for refusing to work on the Sabbath, while providing Sabbath work proscriptions to inmates of other

faiths.  However, as set forth above, the Court's qualified immunity analysis does not end there. As previously explained in Section III, B, 1 of this Opinion, a fact question exists regarding whether Williams ordered Albrecht to work his job as a shower runner or the unassigned job of first shift unit cleanup detail.  Thus, as also explained, even if the Court were to find that Albrecht's claimed constitutional right was not clearly established at the time of the incident, if Williams disciplined Albrecht for refusing to work a job to which Albrecht was never assigned, then the Court would nevertheless find that Williams is not entitled to qualified immunity.  As a result, at this time, the Court finds that Williams is not entitled to qualified immunity with respect to Albrecht's equal protection claim.

### 4.  Albrecht's First Amendment Retaliation Claims

Albrecht claims that both Williams and Stise unlawfully retaliated against him for exercising his First Amendment rights.  In order to state a retaliation claim under the First Amendment, Albrecht must establish that (1) he engaged in a protected activity, (2) Defendants' retaliatory actions were sufficient to deter a person of ordinary firmness from exercising his or her rights, and (3) there was a causal connection between the protected activity and the retaliatory action.  *See Lauren W. ex rel. Jean W. v. Deflaminis*, 480 F.3d 259, 267 (3d Cir. 2007).

### a.  Against Williams

With respect to Williams, Albrecht argues that he was impermissibly retaliated against for exercising his right to free expression and his right to petition the government.  Specifically, Albrecht claims to have engaged in the following activities, which he contends are constitutionally protected: (1) observed his faith's command to abstain from work on Sundays; (2) exercised his right to appeal the disciplinary charges levied against him by Williams; (3)

24

wrote a complaint letter about Williams to the prison's administrator; (4) submitted grievances complaining about Williams' on-going retaliation; and (5) filed his Complaint and Amended Complaints against Williams.

Further, Albrecht argues that as a result of engaging in the aforementioned protected activities he suffered adverse actions sufficient to deter a person of ordinary firmness from exercising his constitutional rights.  In this regard, Albrecht argues that Williams issued disciplinary charges against him, which resulted in sanctions and the loss of his job, for expressing his right to abstain from work on Sundays.  Albrecht also contends that in response to his "having exercised his right to appeal the disciplinary charges, write a complaint letter about Williams to the prison's administrator, submit grievances about the on-going retaliation, mail legal documents, and file the instant lawsuit and amended complaints" (Pl's Reply Br. at 16), he "was subjected to a daunting series of adverse actions[.]" (Pl's Br. at 14).  Indeed, Albrecht argues that "Williams engaged in a malicious and vindictive campaign to deprive plaintiff visits, to deny him access to dental and medical care, to deprive him of the right to worship, to deny him access to legal reference materials, and to interfere with outgoing legal mail."  (*Id*.; *see* Pl's L.Civ.R. 56.1 Statement at ¶¶ 27, 31, 38, 40, 42, 49-54, 58-63, and 64).

Moreover, Albrecht argues that there is a causal connection between the protected activity and the retaliatory action.  With respect to the Sunday, April 27, 2003 incident, Albrecht argues that as Williams' own report indicates, Williams issued the disciplinary charges against Albrecht only after Albrecht informed Williams of his religious beliefs requiring him to abstain from work on Sundays.  In addition, Albrecht claims that Williams disparaged Albrecht's religious beliefs by stating "I don't care about your Sabbath" and then immediately proclaimed "you won't work

any more." (Pl's Decl. at ¶ 28). Albrecht argues that the fact that other prisoners assigned to work first shift unit cleanup had refused to work and had not been sanctioned "is strong evidence that Williams issued the work lay-in and disciplinary charge in response to plaintiff's expression of faith, and what was a sincerely held belief in abstaining from work." (Pl's Br. at 16). Further Albrecht argues that even if the work lay-in and disciplinary charge constituted a valid act, which Albrecht contests, Albrecht argues that Williams' conduct would nevertheless amount to actionable retaliation because it was taken in retaliation for Albrecht's exercise of his First Amendment speech.

Similarly, Albrecht argues that there is a clear causal connection between the "daunting series of adverse actions" he suffered and the other protected activity in which he engaged. For example, Albrecht argues that before engaging in his campaign of retaliation, "Williams threatened plaintiff after he filed his disciplinary appeal and complaint letter, saying 'I hope you know who you're dealing with.'" (Pl's Br. at 17). In addition, Albrecht argues that after Williams refused to accept Albrecht's legal mail, Williams "entered plaintiff's cell, pushed him, and threatened him again, saying he was going to 'make things real difficult' for plaintiff." (*Id*.) Albrecht also claims that after he filed his lawsuit, "Williams began pointing [him] out to other correctional officers, saying 'that's the guy who's suing me.'" (*Id*.) Albrecht argues that Williams' "remarks demonstrate actual knowledge of plaintiff's efforts to seek redress for his grievances, and reveal an explicit intent to retaliate." (*Id*.) Further, Albrecht claims that each time Williams threatened him, even after Albrecht filed his Second Amended Complaint, the retaliatory actions escalated. As a result, Albrecht contends that summary judgment is

appropriate because the evidence proves that Williams retaliated against him for exercising his First Amendment rights to free expression and to petition the government.

Williams opposes Albrecht's retaliation claim and argues that summary judgment should be granted in his favor on same.  Specifically, Williams claims that even if the Court were to assume that Albrecht had engaged in a constitutionally protected action and that he had been subjected to adverse action, Albrecht has not established a causal connection between the protected activity and the adverse action.  In this regard, with respect to the April 27, 2003 incident, Williams argues that it was Albrecht's "refusal to work and obey prison rules, not his religion, that was the substantial or motivating factor in the decision to discipline him."  (Def.'s Opp. Br. at 18).  Indeed, Williams argues that he was not the officer with whom Albrecht had made the arrangement not to work on Sundays and that he had know way of knowing at the time that Albrecht had any legitimate religious reason for declining to work.  Further, Williams points out that inmates generally cannot negotiate the terms of their work assignment.  Williams also notes that while Albrecht was assigned to work second shift, Albrecht had no set work hours. Williams argues that he "asked an inmate to complete his assigned work task, and that inmate declined."  (*Id*. at 19).  Williams further argues that "[r]efusal to work is a violation of the inmate disciplinary rules."  (*Id*.)  Thus, Williams argues that Albrecht's violation of the prison rules, not his religion, led to the disciplinary charges levied against him, and, consequently, there was no retaliation.

In addition, Williams claims that Albrecht has failed to produce any evidence to support his other claims of retaliation.  On this point, Williams argues that he has consistently and continues to maintain that Albrecht was not deprived of visits or medical passes.  To support this

27

argument Williams points to specific instances where Albrecht claims to have been denied a visit

or a pass but where Williams argues that the evidence establishes that the opposite is true.  For

example, Williams notes that Albrecht alleges that he was denied access to the law library on

October 1, 2003.  Williams, however, argues that the Traffic Control Log for that date shows that

Albrecht was issued a pass for the purpose of picking up cases.  Similarly, Williams notes that

Albrecht claims that he was prevented from visiting with his uncle on December 4, 2003, but

Williams also argues that the Visit Detail Report for that date indicates that "Albrecht did, in

fact, have a window visit with his uncle that date."  (*Id.*)  In addition, Williams argues that "the

record is bereft of even a scintilla of evidence" that would connect him to Albrecht being

allegedly denied permission to participate in the March 27, 2005 Easter services by unnamed

members of the prison's custody staff.  (*Id.* at 14-15).  As a result, Williams asks that summary

judgment be granted in his favor because Albrecht "has not submitted any evidence to support

his allegation that the retaliation ever took place."  (*Id.*)

Albrecht responds to Williams' claim that he has failed to put forth any evidence to

support his claim for retaliation.  Specifically, Albrecht points out that while his name may have

appeared on the Traffic Control Log to pick up cases on October 1, 2003, the subsequently

produced Traffic Control Log, which includes the day's end entries, "clearly shows that plaintiff

never reported to Traffic Control for his pass, corroborating the claim that Williams never let

plaintiff out of his cell." (Pl's Reply Br. at 18).  Likewise, Albrecht notes that while "a visit detail

report shows that plaintiff received a visit from his uncle on December 4, 2003 . . . [t]he post-

discovery G-81 traffic control journal clearly reflects that plaintiff never arrived at Traffic

Control to pick up a visit badge, and even includes an entry which 'cancelled' his window visit

with his uncle, strong corroborating evidence in support of plaintiff's claim that Wiliams never let plaintiff out of the cell to pick up a visit badge." (*Id.*)  Further, Albrecht argues that "the underlying facts, strong circumstantial evidence, and the inferences that arise from that evidence," support Albrecht's claim that Williams was responsible for the retaliatory behavior that caused him to be denied permission to attend Easter Sunday Mass on March 27, 2005.

The Court finds that genuine issues of material fact exist, which require both Albrecht and William's motions for summary judgment be denied.  As an initial matter, the Court notes that for the purposes of the pending motions, Williams assumed that "Albrecht was pursuing a constitutionally protected activity and that he was subjected to adverse action."  (Def.'s Opp'n Br. at 18).[4] As such, the Court's inquiry is focused on whether there is a causal connection between the protected activity engaged in by Albrecht and the alleged retaliatory actions taken by Williams.  The Court finds that there is sufficient evidence from which a reasonable jury could

_____

[4]While assumed by Defendants for the sake of the pending motions, the Court finds that the following activities engaged in by Albrecht are constitutionally protected: (1) observing his faith's command to abstain from work on Sundays (*see Cruz*, 405 U.S. at 322 (holding that First Amendment prohibits government from making law that prohibits free exercise of religion)); (2) exercising his right to appeal the disciplinary charges levied against him by Williams; (3) writing a complaint letter about Williams to the prison's administrator; (4) submitting grievances complaining about Williams' on-going retaliation; and (5) filing his Complaint and Amended Complaints against Williams.  *See, e.g., Bill Johnson's Restaurants, Inc. v. N.L.R.B.*, 461 U.S. 731, 741, 103 S.Ct. 2161, 76 L.Ed.2d 277 (1983) (holding that right to access courts is aspect of First Amendment right to petition government for redress of grievances); *Todaro v. Bowman*, 872 F.2d 43, 49 (holding that prisoner's letters complaining about prison conditions were protected speech under First Amendment).  The Court similarly finds that there is sufficient evidence to establish that the alleged retaliatory actions taken by Williams were sufficient to deter a person of ordinary firmness from exercising his or her rights.  In this regard the Court finds that all of the following alleged retaliatory actions would be sufficient to deter a person of ordinary firmness from engaging in the protected activity: facing disciplinary charges, being sanctioned, losing one's job, having one's legal mail interfered with and being denied visits, access to dental and medical care, the right to worship and access to legal reference materials.

29

determine that a causal connection exists; though the evidence is not so strong as to require such a finding.  For example, given the following combination of factors, the Court finds that a reasonable jury could determine that Williams retaliated against Albrecht for exercising his faith: (1) Albrecht informed Williams' of his religious beliefs before disciplinary charges were issued; (2) Williams responded to Albrecht's explanation of his religious beliefs by saying "I don't care about your Sabbath"; (3) Albrecht was disciplined despite the fact that he was not assigned to work first shift unit cleanup; and (4) the individuals assigned to work first shift unit cleanup who refused to work were not disciplined.  (Pl.'s L.Civ.R. 56.1 Statement at ¶¶ 12, 13 and 17).

Further, while Williams' argues that there is no evidence to support Albrecht's other claims of retaliation, the Court disagrees.  Instead there is sufficient evidence from which a reasonable jury could conclude that Williams retaliated against Albrecht.  For example, while Williams relies on various Traffic Control Logs to establish that Albrecht was not deprived of visits or medical passes, Albrecht counters Williams' argument by noting that subsequently produced Traffic Control Logs, which include the pertinent days' end entries, show that while Albrecht was listed to pick up various passes, Albrecht never reported to Traffic Control to pick up same.  The Court agrees with Albrecht, that this evidence corroborates Albrecht's claim that Williams never let him out of his cell to pick up the passes.  Similarly, the Court finds that a reasonable jury could rely on the following circumstantial evidence to conclude that Williams was responsible for preventing Albrecht from attending Easter Sunday Mass on March 27, 2005: (1) Williams' threats that he hoped Albrecht knew who he was dealing with and that Williams was going to "make things real difficult" for Albrecht (Pl.'s L.Civ.R. 56.1 Statement at ¶¶ 22 and 40); (2) Williams' comment to Albrecht that he was a union official (*Id*. at ¶ 23); and (3) the fact

that Williams pointed Albrecht out to his fellow correctional officers and indicated that "that's the guy who's suing me." (*Id*. at ¶ 48).

In addition, the Court finds that there is sufficient evidence from which a jury could determine that a causal connection exists between Albrecht's other protected activities (i.e. appealing the disciplinary charges levied by Williams, writing a complaint letter about Williams to the prison's administrator, submitting grievances regarding Williams' on-going retaliation and filing the Complaint and Amended Complaints in this action) and the alleged retaliatory actions undertaken by Williams. For example, the following evidence put forth by Albrecht supports his claim that a causal connection exists: (1) after Albrecht filed his disciplinary appeal and complaint letter, and before the alleged campaign of retaliation began, Williams threatened Albrecht saying, "I hope you know who you're dealing with" (Pl.'s L.Civ.R. 56.1 Statement at ¶ 22); (2) after Williams refused to accept Albrecht's legal mail, Williams entered Albrecht's cell, pushed him and said that he was going to "make things real difficult" for Albrecht (*Id*. at ¶ 40); and (3) after Albrecht initiated the instant litigation, Williams began pointing Albrecht out to other correctional officers, saying "that's the guy who's suing me." (*Id*. at ¶ 48). While this evidence is not so overwhelming as to require that summary judgment be granted in Albrecht's favor, it is more than sufficient to defeat Williams' cross-motion for summary judgment.

Having determined that Albrecht has a viable First Amendment retaliation claim against Williams, the Court next examines whether qualified immunity would protect Williams from this claim. As previously explained, in order for Albrecht to avoid the effects of qualified immunity, he must show that it would have been clear to a reasonable corrections officer that the conduct engaged in by Williams was unlawful in the situation presented. Here, Albrecht alleges that

31

Williams disciplined him, deprived him of visits and the right to worship, denied him access to dental and medical care, denied him access to legal reference materials and interfered with his outgoing legal mail all with a malicious and retaliatory intent.  It is clear to the Court that "a reasonable governmental officer would understand that maliciously" disciplining an inmate and engaging in the other alleged actions "to retaliate against [the inmate] for exercising h[is] rights" to worship and petition the government for redress "runs afoul of the First Amendment."  *R.K.*, 2008 WL 4792673, at *6.  In addition, as set forth above, the Court has already determined that Albrecht has set forth sufficient evidence from which a jury could find that Williams acted with this retaliatory intent.  Consequently, the Court finds that Williams is not entitled to qualified immunity with respect to Albrecht's retaliation claim.

### b.      Against Stise

With respect to Stise, Albrecht argues that on April 5, 2004, Stise retaliated against him after he engaged in the following protected activities: (1) Albrecht asked Stise to let him out so that he could attend set-up for the weekly Catholic Mass; and (2) Albrecht asked Stise for a grievance form so that he could file a complaint regarding the fact that Stise refused to let him attend the aforementioned set-up.  After engaging in these protected activities, Stise let Albrecht leave to attend Catholic Mass.  Stise then searched Albrecht's cell, allegedly "mutilating photographs, and confiscating approved food items."  (Pl.'s Reply Br. at 3).  Albrecht claims that Stise retaliated against him by conducting the destructive cell search minutes after he exercised his First Amendment rights.  In addition, Albrecht claims that the casual connection between the protected activity and the retaliatory search is established by the timing of same: "the search was initiated within minutes of plaintiff leaving the unit to attend Catholic Mass[.]" (Pl.'s Br. at 18).

32

Indeed, Albrecht contends that "plaintiff has demonstrated that the exercise of his right to attend religious services, and his right to complain through the grievance system, were substantial motivating factors in conducting the search." (*Id*. at 19). Further, Albrecht claims that "the absence of a search log, and the failure to produce the DOC policy on that subject . . . shows both a failure to follow established procedures and, by adverse inference, an unlogged search conducted in retaliation for plaintiff's complaints."[5] (*Id*. at 20).

Stise does not specifically argue that he did not retaliate against Albrecht. Instead, Stise claims that the only harm alleged by Albrecht from Stise's conduct was the destruction of property and "'a deprivation of a constitutionally protected property interest caused by a state employee's . . . conduct does <u>not</u> give rise to a § 1983 procedural due process claim, unless the State fails to provide an adequate postdeprivation remedy.'" (Def.'s Opp'n Br. at 24 (quoting *Zinermon v. Burch*, 494 U.S. 113, 115, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990) (emphasis supplied))). Stise contends that the New Jersey Tort Claims Act, N.J.S.A. 59:1-1, *et seq*., "provides a monetary damage remedy for the loss or deprivation of property by state officials." (*Id*.) As a result, Stise claims that "any negligent or intentional loss or deprivation by State prison officials of property belonging to plaintiff does not state a claim for relief, as the state judicial forum provides an adequate postdeprivation remedy." (*Id*.)

The Court finds that Stise's argument misses the mark. Albrecht did not bring a § 1983 procedural due process claim against Stise. Instead, Albrecht brought a § 1983 retaliation claim

---

[5]The Court notes that it specifically ruled that Defendants did not have to produce search log records for April 5, 2004 because their production could compromise the security of the prison. (*See* 2/13/2007 Court Order -Docket Entry No. 85). The Court also permitted Defendants to produce the search policy in redacted format. (*Id*.) Consequently, the Court finds that no adverse inference is warranted.

against Stise based on Stise's alleged illegal retaliation against Albrecht for engaging in the exercise of his protected First Amendment rights.  Stise cites no law for the proposition that the New Jersey Tort Claims Act bars First Amendment retaliation claims brought under § 1983. Consequently, the Court shall not dismiss Albrecht's retaliation claim against Stise on this ground.

With respect to Albrecht's retaliation claim, the Court finds that Albrecht engaged in a protected activity when he asked Stise to let him out so that he could attend set-up for the weekly Catholic Mass and when he asked Stise for a grievance form so that he could file a complaint regarding the fact that Stise refused to let him attend the aforementioned set-up.  *See  Cruz v. Beto*, 405 U.S. at 322; *Bill Johnson's Restaurants,* 461 U.S. at 741; *Todaro*, 872 F.2d at 49.  The Court also finds that the threat of having one's personal property destroyed is sufficient to deter a person of ordinary firmness from exercising his or her First Amendment rights.  Further, the Court finds that there is sufficient evidence from which a jury could find that a causal connection existed between Albrecht's exercise of his First Amendment rights and Stise's allegedly destructive cell search.  In this regard, the Court finds that a reasonable jury could conclude that such a causal connection exists based on the timing of Stise's search in relation to Albrecht's exercise of his First Amendment rights.  *Rauser v. Horn*, 241 F.3d 330, 334 (3d Cir. 2001) (finding that temporal proximity between prisoner's insistence on First Amendment rights and prisoner's transfer and wage reduction probative of causation).

Having determined that Albrecht has a viable First Amendment retaliation claim against Stise, the Court turns next to the question of whether qualified immunity would nonetheless protect Stise from this claim.  As outlined above, in order for Albrecht to avoid the effects of

qualified immunity, he must show that it would have been clear to a reasonable corrections officer that the conduct engaged in by Stise was unlawful in the situation presented.  Here, Albrecht alleges that Stise conducted a destructive search of his cell with a malicious and retaliatory intent.  Similar to the Court's finding regarding Williams, the Court finds that "a reasonable governmental officer would understand that maliciously" and destructively searching an inmates cell "to retaliate against [the inmate] for exercising h[is] rights" to worship and petition the government for redress "runs afoul of the First Amendment."  *R.K.*, 2008 WL 4792673, at *6.  Further, as set forth above, the Court has already determined that Albrecht has set forth sufficient evidence from which a jury could reasonably find that Stise acted with this retaliatory intent.  Consequently, the Court finds that Stise is not entitled to qualified immunity with respect to Albrecht's retaliation claim.

C. **State Law Claims**

As the Court has determined that Albrecht's federal claims have survived Defendants' Cross-Motion for Summary Judgment, the Court shall exercise supplemental jurisdiction over Albrecht' state law claims.  The sufficiency of those claims is discussed below.

1. **Albrecht's New Jersey Law Against Discrimination Claim**

According to the New Jersey Law Against Discrimination (the "LAD"):

> All persons shall have the opportunity to obtain employment, and
> to obtain all the accommodations, advantages, facilities, and
> privileges of any place of public accommodation, publicly assisted
> housing accommodation, and other real property without
> discrimination because of race, creed, color, national origin,
> ancestry, age, marital status, affectional or sexual orientation,
> familial status, disability, nationality, sex, gender identity or
> expression or source of lawful income used for rental or mortgage
> payments, subject only to conditions and limitations applicable

35

> alike to all persons. This opportunity is recognized as and declared
> to be a civil right.

N.J.S.A. 10:5-4.

The LAD also provides that:

> It shall be an unlawful employment practice, or, as the case may be,
> an unlawful discrimination . . . [f]or any owner, lessee, proprietor,
> manager, superintendent, agent, or employee of any place of public
> accommodation directly or indirectly to refuse, withhold from or
> deny to any person any of the accommodations, advantages,
> facilities or privileges thereof, or to discriminate against any person
> in the furnishing thereof . . . .

N.J.S.A. 10:5-12(f)(1).  Under the provisions of the LAD, prisons qualify as places of

accommodation.  *See Chisolm v. McManimon* 97 F.Supp.2d 615, 621-22 (D.N.J. 2000), *rev'd on

other grounds*, 275 F.3d 315 (predicting that New Jersey Supreme Court would hold that prisons

are places of public accommodation).

As with his equal protection claim, Albrecht claims that Williams discriminated against

him in violation of the LAD because Albrecht, as a practicing Catholic, was denied the right to

abstain from work on the Sabbath, while members of other religious groups are entitled to

Sabbath work proscriptions.  In this regard, Albrecht argues that "[t]he DOC's policy of

recognizing work proscriptions for Jews, Muslims, and Seven Day Adventists, but not Catholics,

is repugnant to Catholic Cannon law, is not a condition or limitation applicable alike to all

persons, and is clearly discriminatory."  (Pl.'s Br. at 28).  As a result, Albrecht argues that

"[s]ummary judgment on plaintiff's LAD claim is appropriate because no finding of fault or

intent is required to show that he was discharged from his work assignment because DOC policy

did not recognize his religious work proscription."  (*Id.*)

Relying on the arguments raised in opposition to Albrecht's equal protection claim, Williams contends that Albrecht's LAD claim should be dismissed because Albrecht "has adduced no evidence to show that he was discriminated against." (Def.'s Opp'n Br. at 31). Again, Willimas argues that Albrecht's "own deposition testimony indicates that Catholics, like other religions, were excused from work to attend religious services, and that Albrecht was not generally required to work on Sundays." (*Id*.)

For the same reasons discussed above in Section III, B, 3 "Albrecht's Fourteenth Amendment Equal Protection Claim Against Williams," the Court finds that Albrecht has set forth sufficient evidence of discrimination to proceed with his LAD claim. In addition, also for the same reasons set forth in that Section, the Court finds that summary judgment should not be granted in Albrecht's favor on his LAD claim at this time.

### 2.      Albrecht's Harassment Claim

In *Paternoster v. Shuster*, 296 N.J. Super. 544 (App. Div. 1997), the New Jersey Appellate Division implicitly recognized a civil cause of action for harassment relying on N.J.S.A. 2C:33-4, which defines harassment in the criminal context as follows:

> Except as provided in subsection e., a person commits a petty disorderly persons offense if, with purpose to harass another, he:
>
> a. Makes, or causes to be made, a communication or communications anonymously or at extremely inconvenient hours, or in offensively coarse language, or any other manner likely to cause annoyance or alarm;
>
> b. Subjects another to striking, kicking, shoving, or other offensive touching, or threatens to do so; or

37

> c. Engages in any other course of alarming conduct or of repeatedly committed acts with purpose to alarm or seriously annoy such other person.

While the New Jersey Supreme Court has yet to affirmatively decide the issue, this Court predicts that when it does, the New Jersey Supreme Court will find that a civil cause of action for harassment exists under New Jersey law.  The Court also finds that where a plaintiff's claim for damages based on harassment are "closely allied to one for the intentional infliction of emotional distress," then that plaintiff must "meet the damage threshold for that cause of action[.]" *Aly v. Garcia*, 333 N.J. Super. 195, 204 (App. Div. 2000).

Albrecht argues that "Williams'[] vindictive course of retaliation, which included numerous verbal threats, and at one point a shove, and [which] caused plaintiff to seek and undergo extensive treatment by a psychiatrist and psychologist, were purposefully done and clearly meet the statutory elements of harassment."  (Pl.'s Br. at 29).  Consequently, Albrecht contends that summary judgment should be granted in his favor on this claim.

Williams, however, argues that Albrecht's harassment claim should be dismissed because "[i]n order to state a claim for harassment, if such a claim exists at all under New Jersey Law, . . . a plaintiff must meet the injury requirements sufficient to state a claim for intentional infliction of emotional distress[,]" and "Albrecht has failed to meet this threshold."  (Def.'s Opp'n Br. at 32).  Specifically, Williams argues that "[t]here is no evidence in this case that the defendants have engaged in extreme and outrageous conduct that is so severe it could not be borne by a reasonable person."  (*Id*. at 29).  Instead, Williams claims that Albrecht alleges only "minor incidents" and that "[n]one of these claims are legally sufficient to establish extreme conduct on the part of the defendant[.]" (*Id*.)

As described below in Section III, B, 3 "Albrecht's Intentional and Negligent Infliction of Emotional Distress Claims," the Court finds that Albrecht has set forth a viable intentional infliction of emotional distress claim; though genuine issues of material fact exist, which prevent the Court from granting summary judgment in Albrecht's favor on that claim.  As a result, the Court finds that Albrecht's harassment claim is likewise viable.

###    3.    Albrecht's Intentional and Negligent Infliction of Emotional Distress Claims

In order to succeed on a claim of intentional infliction of emotional distress, "the plaintiff must establish intentional and outrageous conduct by the defendant, proximate cause, and distress that is severe." *Buckley v. Trenton Saving Fund Soc'y*, 111 N.J. 355, 366 (1988).  Thus, to be successful, a plaintiff must prove the following four elements.  First, the plaintiff must prove that "the defendant acted intentionally or recklessly, both in doing the act and in producing emotional distress[.]" *Wigginton v. Servidio*, 324 N.J. Super. 114, 130 (1999) (citing *Buckley*, 111 N.J. at 366).  Second, the plaintiff must establish that "the defendant's conduct was so outrageous in character and extreme in degree as to go beyond all bounds of decency[.]" *Id*. Third, the plaintiff must show that "the defendant's actions must have been the proximate cause of the plaintiff's emotional distress." *Buckley*, 111 N.J. at 366.  Fourth, the plaintiff must prove that "the emotional distress suffered by the plaintiff" was "so severe that no reasonable man could be expected to endure it." *Id*. (internal quotation marks and citation omitted).

The proof required to succeed on a claim for negligent infliction of emotional distress is similar to that needed to prove intentional infliction of emotional distress.  "Recovery for negligent infliction of emotional harm requires that it must be reasonably foreseeable that the

tortious conduct will cause genuine and substantial emotional distress or mental harm to average persons." *Decker v. Princeton Packet, Inc.*, 116 N.J. 418, 430 (1989).  However, unlike with claims for intentional infliction of emotional distress, to succeed on a negligent infliction of emotional distress claim, the plaintiff must not only establish that the negligent conduct proximately caused the harm, but also that the defendant owed the plaintiff "a legal duty to exercise reasonable care." *Id*. at 429.

Here Albrecht argues that the undisputed facts establish that Williams both intentionally and negligently inflicted severe emotional distress on him.  Albrecht argues that Williams' intent to inflict harm, as well as the extreme and outrageous nature of Williams' conduct can be seen through Williams' own words:  "I don't care about your Sabbath" and he would "make things real difficult" for Albrecht (Pl.'s L.Civ.R. 56.1 Statement at ¶¶ 13 and 40), and through Williams' "campaign of vindictive harassment[.]"  (Pl.'s Br. at 29).  Further, Albrecht argues that there is no doubt regarding the severity of the emotional distress caused by Williams because Albrecht was forced to seek professional treatment to deal with same as he was unable to "endure it on his own."  (*Id*. at 30).  Indeed, Plaintiff claims that as a result of the emotional distress caused by Williams, "he was diagnosed with anxiety and depression severe enough to require long-term therapy and treatment with medications."  (*Id*. at 31; *see* Pl.'s L.Civ.R. 56.1 Statement at ¶ 45).  Plaintiff also argues that the severity of the emotional distress can be seen by the fact that Williams had "his father and attorney visit prison officials to address the abuse[.]" (*Id*. at 30; *see* Pl.'s L.Civ.R. 56.1 Statement at ¶ 44).  In addition, with respect to his claim of negligent infliction of emotion distress, Albrecht argues that according to both N.J.S.A. 30:1B-3(c) and

N.J.A.C. 10A:1-1.1(a)(7), Williams was "obliged . . . to 'protect' plaintiff from being victimized" and therefore owed him a legal duty of reasonable care.  (Pl.'s Br. at 32).

In contrast, Williams argues that the Court should dismiss Albrecht's claims for intentional and negligent infliction of emotional distress because they are not supported by the record.  Specifically, Williams claims that "[t]here is no evidence in this case that the defendants have engaged in extreme and outrageous conduct that is so severe it could not be borne by a reasonable person."  (Def.'s Opp'n Br. at 29).  Instead, Williams argues that Albrecht alleges only "minor incidents" (i.e., that "he was denied visits on two occasions, that he was prohibited from attending religious services on three occasions, and that his legal mail was once not accepted for mailing by Officer Williams") and that "[n]one of these claims are legally sufficient to establish extreme conduct on the part of the defendant[.]" (*Id.*)  Moreover, Williams argues that none of Albrecht's allegations are supported by any evidence.  Further, Williams contends that Albrecht's claims for negligent infliction of emotional distress must fail because in order to succeed on such a claim, "a plaintiff must demonstrate 'fright from a reasonable fear of immediate personal injury' which resulted in substantial bodily injury or sickness" and Albrecht "has not pled any incident that could establish an imminent fear of physical harm."  (*Id*. at 30 (quoting *Falzone v. Busch*, 45 N.J. 559, 569 (1965))).

The Court finds that genuine issues of material fact prevent it from granting summary judgment in either Albrecht or Williams' favor with respect to Albrecht's claims for intentional and negligent infliction of emotional distress.  With respect to the intentional infliction of emotional distress claim, the Court finds that Williams' intent to cause emotional distress may be inferred from the remarks made by Williams to Albrecht: "I don't care about your Sabbath" and

he would "make things real difficult" for Albrecht (Pl.'s L.Civ.R. 56.1 Statement at ¶¶ 13 and

40), as well as from the allegedly harassing and retaliatory actions Williams took against

Albrecht.  *See Wigginton*, 324 N.J. Super. at 131 (finding that "each defendant's intent to cause

emotional distress" could be inferred from remarks uttered to plaintiff).  As a result, the Court

finds that whether such intent existed is a question for the factfinder.  *Id.*

      In addition, the Court finds that if a jury accepts that Williams engaged in the following

pattern of behavior alleged by Albrecht, then a reasonable jury could also find that the alleged

conduct was "so outrageous in character, and so extreme in degree, as to go beyond all possible

bounds of decency" (*Buckley*, 111 N.J. at 366 (internal quotation marks and citation omitted)):

(1)Williams intentionally discriminated against Albrecht because of his religious beliefs and

(2)after Albrecht sought to vindicate his rights, Williams began retaliating against him by (a)

threatening Albrecht with remarks like "I hope you know who you're dealing with" and telling

Albrecht that he would "make things real difficult" for him (Pl.'s L.Civ.R. 56.1 Statement at ¶¶

22 and 40) ; and (b) "denying him visits with family and friends, denying him access to medical

and dental care, denying him access to religious services, refusing to accept or process legal mail,

and denying him access to the law library" (*Id*. at ¶ 26; *see also Id*. at ¶¶ 27, 29, 31, 38, 42, 49 -

54, 58 - 63 and 65).  In addition, the Court finds that, if a jury believes that Williams' engaged in

the conduct alleged, then the jury could likewise find that that conduct was the proximate cause

of Albrecht's emotional distress.

      Further, the Court notes that "[t]he severity of the emotional distress raises questions of

both law and fact . . . . [T]he court decides whether as a matter of law such emotional distress can

be found, and the jury decides whether it has in fact been proved." *Id*. at 367.  Here, the Court

finds that as a matter of law, Albrecht's claims of emotional distress, which allegedly (1) caused him to have his father and an attorney meet with prison officials "to discuss the on-going retaliation and physical threats by Williams[;]" (2) led him to seek medical "treatment for anxiety, anguish, and distress[;]" and (3) resulted in him being "diagnosed with anxiety and depression which required on-going therapy and treatment with medications[,]" are legally sufficient.  (Pl.'s L.Civ.R. 56.1 Statement at ¶¶ 44-45).  The question of whether, in fact, Albrecht's claims have been proved shall be left to the factfinder to decide.

As with Albrecht's intentional infliction of emotional distress claim, which is sufficient to present to a jury, but not so strong as to require that summary judgment be granted on same, Albrehct's negligent infliction of emotional distress claim also survives Williams' Cross-Motion for Summary Judgment, but does not warrant summary judgment being granted in Albrecht's favor on the claim.  At the outset, the Court rejects Williams' contention that in order to recover for negligent infliction of emotional distress, Albrecht "must demonstrate 'fright from a reasonable fear of immediate personal injury' which resulted in substantial bodily injury or sickness[.]" (Def.'s Opp'n at 30 (quoting *Falzone*, 45 N.J. at 569)).  The *Falzone* decision was rendered nearly fifty years ago and involved a factually distinct claim for negligent infliction of emotional distress:  there the plaintiff's claim arose from the fact that while she was seated in her husband's "lawfully parked automobile close to the place where her husband was struck[,] . . . the defendant's negligently driven automobile 'veered across the highway and headed in the direction of plaintiff' coming 'so close to plaintiff as to put her in fear for her safety.'" *Falzone*, 45 N.J. at 561.  Thus, the question decided in *Falzone* was whether "the plaintiff may recover for bodily injury or sickness resulting from fear for her safety caused by a negligent defendant, where

the plaintiff was placed in danger by such negligence although there was no physical impact." *Id*. As a result, the standard set forth by Williams that, in order to succeed on a negligent infliction of emotional distress claim, a plaintiff "must demonstrate 'fright from a reasonable fear of immediate personal injury' which resulted in substantial bodily injury or sickness" (Def.'s Opp'n at 30 (quoting *Falzone*, 45 N.J. at 569)) must be understood in the context that *Falzone* was decided.

The Court finds that as a general matter, "[r]ecovery for negligent infliction of emotional harm [only] requires that it must be reasonably foreseeable that the tortious conduct will cause genuine and substantial emotional distress or mental harm to average persons" and that to succeed on such a claim, the plaintiff must establish that the defendant owed him "a legal duty to exercise reasonable care." *Decker*, 116 N.J. at 429-30.  Here, Williams had a statutory and regulatory obligation to exercise reasonable care to prevent Albrecht from being victimized in prison.  Therefore a legal duty exists.  Further, the Court finds that if a jury believes that Williams' engaged in the tortious conduct, then it would be reasonably foreseeable that that conduct would "cause genuine and substantial emotional distress or mental harm to average persons." *Id*. at 430.  In addition, as described above, the emotional distress alleged by Albrecht is legally sufficient, and therefore it is for a jury to determine whether Albrecht has established that he suffered same.

### 4.      Albrecht's Assault and Battery Claims

Under New Jersey law, "[a] person is subject to liability for the common law tort of assault if: '(a) he acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and (b) the other is

44

thereby put in such imminent apprehension." *Leang v. Jersey City Board of Education*, 198 N.J. 557, 591 (2009) (quoting *Wigginton v. Servidio*, 324 N.J. Super. 114, 129 (App. Div. 1999) (quoting Restatement (Second) of Torts § 21 (1965))).  Further, [t]he tort of battery rests upon a nonconsensual touching.  *Id*.

Albrecht argues that the evidences establishes that Williams assaulted and battered him. In this regard, Albrecht argues that "Williams'[] thinly veiled but repeated threats, combined with his physical contact with plaintiff in the cell, accompanied by the threat to 'make things real difficult,' was an intentional display of force."  (Pl's. Br. at 33).  Further Albrecht argues that the ability to inflict injury on Albrecht was likewise "present when Williams pushed plaintiff" (*Id*.); an act that Albrecht claims can "not be divorced from the fact that Williams is a state actor, cloaked with the authority of state law, and empowered to use force up to an [sic] including deadly force, if necessary, to subdue a prisoner."  (*Id*.)  As such, Albrecht argues that "[t]he threat of force was real and palpable."  (*Id*.)  Indeed, Albrecht claims that "Williams actually pushed plaintiff."  (*Id*.; Pl.'s L.Civ.R. 56.1 Statement at ¶ 40).  Further, Albrecht claims that his reaction to Williams' behavior shows that Albrecht imminently feared further bodily harm.  In this regard, Albrecht notes that he "contact[ed] his father in order to request an emergency meeting with the prison's assistant superintendent" and was forced "to seek medical treatment for severe emotional distress[.]" (*Id*.)  Based on these facts, Albrecht argues that summary judgment should be granted in his favor on his assault and battery claims.

In contrast, Williams argues that Albrecht fails to state a claim for assault or battery under New Jersey law and that, as a result, these claims should be dismissed.  With respect to Albrecht's battery claim, Williams argues that Albrecht "pleads no instance of offensive touching

45

sufficient to establish a battery."  (Def.'s Opp'n Br. at 33).  Further, with respect to Albrecht's

claim of assault, Williams argues that Albrecht's "claims that he was threatened, even if true, are

not imminent threats, but rather a generalized statement that things would be made difficult for

him."  (*Id*.)

The Court finds that Albrecht has put forth enough evidence that a reasonable jury could

return a verdict in his favor on his claims for assault and battery.  In this regard, the threats made

by Williams, coupled with the fact that Williams pushed Albrecht, along with the fact that

Williams was in a position of authority with respect to Albrecht are sufficient evidence from

which a jury could conclude that Williams intended for Albrecht to fear imminent bodily injury.

Similarly, the fact that Albrecht found it necessary to both have his father arrange a meeting with

the prison's assistant superintendent to discuss the threats being made by Williams and seek

medical treatment are sufficient for a reasonable jury to conclude that Albrecht did, in fact, fear

imminent bodily harm.  Further, the fact that Williams pushed Albrecht is evidence of battery.

Based on the foregoing, the Court finds that a reasonable jury could, though would not

necessarily have to, determine that Williams assaulted and battered Albrecht.  As a result, the

Court finds that neither Albrecht nor Williams is entitled to summary judgment with respect to

these claims.

### 5.    Albrecht's Fraudulent Concealment of Evidence Claim

In New Jersey, in order to succeed on a claim for the fraudulent concealment of evidence,

a plaintiff must prove:

> (1) That defendant . . . had a legal obligation to disclose evidence
> in connection with an existing or pending litigation;

(2) That the evidence was material to the litigation;

(3) That plaintiff could not reasonably have obtained access to the evidence from another source;

(4) That defendant intentionally withheld, altered or destroyed the evidence with purpose to disrupt the litigation;

(5) That plaintiff was damaged in the underlying action by having to rely on an evidential record that did not contain the evidence defendant concealed.

*Estate of Ramona Cordero v. Christ Hospital*, 403 N.J. Super. 306, 320 (App. Div. 2008).

Albrecht claims that Williams knew that this litigation was pending or probable as early as May 2003, and, despite that fact, concealed or destroyed the following evidence: "(1) records of the disciplinary hearing and on-the-spot consent, (2) visit registration records, (3) G-81 Traffic Control journal entries, (4) Traffic Control Log entries, (5) G-86 Wing Officer's Traffic Log, (6) unit search log records, (7) records and investigative reports relating to the meeting between plaintiff's father, the attorney, Superintendent Tyler, and Executive Assistant Troy, and (8) plaintiff's mental health records." (Pl.'s Br. at 34). Albrecht also argues that the missing documents are material to this case. Specifically, he claims that the missing G-86 logs are relevant to his retaliation claims, which are based on Williams refusal to let Albrecht out of his cell for scheduled and unscheduled activities" because the logs "tend to prove, one way or the other, whether Williams actually listed plaintiff for these activities." (*Id*. at 38). Indeed, Albrecht claims that

> "[i]f the missing G-86 logs for July 29, 2004, and October 15, 2004, reflect that defendant Williams never listed plaintiff for the scheduled ultrasound exam and surgery consult, while listing other prisoners for their scheduled passes, then a properly instructed jury could conclude that Williams deliberately omitted plaintiff's name,

47

> a material fact which not only establishes adverse action on the
> retaliation claims, but proves that Williams denied plaintiff access
> to prescribed medical care for a painful gallbladder condition."

(*Id*. at 38-39).  Given the materiality of the destroyed or missing documents, Albrecht argues that

there has clearly been actual disruption to his case.

Further, Albrecht argues that Williams intentionally concealed or destroyed the

aforementioned documents in order to disrupt Albrecht's case.  In this regard, Albrecht claims

that Williams' intentional destruction and/or concealment of evidence can be established in two

ways.  First, Albrecht claims that "[t]he fact that Williams'[] co-workers were unable to find

records needed to assist in the prosecution of claims against their fellow employee is more than

suspicious."  (*Id*. at 36).  As such, Albrecht contends that a reasonable inference can be drawn

from the following facts "to show that Williams, a high ranking union delegate, conspired with

his fellow co-workers to disrupt plaintiff's case by concealing or destroying evidence[:]" (1) Sgt.

Gamble informed Executive Assistant Smith that registration records relating to Donna

Gennello's May 23, 2003 window visit were unavailable because the registration logs were

destroyed after a new computerized system was installed in October 2003; however Williams

was able to produce a paper log of the contact visit Albrecht received on May 24, 2003; (2) the

G-81 traffic control journal entries for May 23, 2003 are missing; however these journals are

hard bound journals that are never destroyed and are reportedly archived at the State Library's

records repository; and (3) the G-86 Wing Officer's Traffic Logs, which are required to be

maintained for at least six years or longer if litigation has ensued, are missing.  (*Id*. at 36-37)

Second, Albrecht argues that even without relying on the alleged conspiracy between

Williams and his co-workers, "[t]here is strong circumstantial evidence . . . that Williams was

48

himself directly responsible for concealing or destroying the G-86 Wing Officer's Traffic Logs." (*Id*. at 37).  Albrecht notes that the G-86 Wing Officer's Traffic Logs are daily records of traffic movements that occur in each unit.  Albrecht states that the daily logs are posted in the officer's booths every morning so that the inmates can see whether they have been issued a pass for any scheduled appointments or activities.  Additionally, Albrecht claims that the daily logs also record unscheduled traffic movements, such as visits.  The G-86 Wing Officer's Traffic Logs include a place for recording the following information: "the wing, date, inmate's name, number, officer's name, destination, time called, time left, and time returned to the unit."  (*Id*. at 37).  Further, Albrecht alleges that a copy of the G-86 form produced by Defendants during discovery contains the following instruction "This completed sheet must be turned into Traffic Control at the end of the day."  (*Id*. (internal quotation marks omitted)).  Albrecht argues that Williams "was personally responsible from completing" the G-86 logs.  (*Id*.)  Albrecht also argues that "[a]ll of the completed G-86 records relating to plaintiff's case are missing."  (*Id*.)  Given Williams' responsibility to complete the G-86 traffic logs and to return them to Traffic Control on a daily basis, coupled with the fact that all of the G-86 records relating to Albrecht's case are missing, Albrecht argues that "[a] reasonable inference can be drawn that Williams willfully concealed or destroyed" same.  (*Id*. at 37-38).

Williams, however, argues that Albrecht's fraudulent concealment claim should be dismissed.  In this regard, Williams does not claim that he did not have an obligation to produce the missing documents or that the missing records are not material to this litigation.  Similarly, Williams does not argue that Albrecht could have obtained the missing documents from a different source or that Albrecht has not been damaged in this matter by the missing evidence.

Instead, Williams claims that as Albrecht admitted at his deposition, Albrecht "has no evidence that Williams was involved in the destruction of documents" and "the majority of the documents sought were outside of Williams' control."  (Def.'s L.Civ.R. 56.1 Statement at ¶ 9).

As an initial matter, the Court finds that all of the records sought by Albrecht are relevant to his claims and material to this litigation.  Further, it appears to the Court that for discovery purposes the missing documents were in Williams' possession, custody or control and that, as such, Williams had an obligation to produce same during discovery.  In addition, the Court believes that Albrecht could not have reasonably obtained access to the missing evidence through other sources.  The Court also finds that Albrecht may be damaged in this litigation by the fact that the records in question are missing.

As such, the pertinent question presented to the Court at this time is whether Williams "intentionally withheld, altered or destroyed" the records identified by Albrecht in order to disrupt the instant litigation.  *Estate of Ramona Cordero*, 403 N.J. Super. at 321.  With respect to the (1) records of the disciplinary hearing and on-the-spot consent, (2) visit registration records, (3) G-81 Traffic Control journal entries, (4) Traffic Control Log entries, (5) unit search log records, (6) records and investigative reports relating to the meeting between plaintiff's father, the attorney, Superintendent Tyler, and Executive Assistant Troy, and (7) plaintiff's mental health records, the Court finds that Albrecht has put forth no credible evidence that Williams was responsible for these documents or that Williams was involved in their destruction.  While the Court appreciates Albrecht's suspicions concerning Williams' co-workers inability to locate the aforementioned records, the Court disagrees that "a reasonable inference can be drawn . . . that Williams . . . conspired with his fellow co-workers to disrupt plaintiff's case by concealing or

50

destroying evidence." (Pl.'s Br. at 37). Albrecht has provided the Court with no evidence of such a conspiracy and neither the fact that Williams was a high ranking union delegate nor the alleged threats made by Williams persuades the Court otherwise. As such, the Court finds that no reasonable jury could conclude that Williams intentionally concealed or destroyed the above-referenced documents. Consequently, the Court shall grant Williams' motion for summary judgment on Albrecht's fraudulent concealment claim with respect to these records.

In contrast, the Court finds that when one considers the fact that all of the completed G-86 records relevant to Albrecht's case are missing along with Williams' responsibility to complete the G-86 Wing Officer's Traffic Logs, coupled with his responsibility to turn the logs in at the end of each day and the DOC's records retention policy that these logs are maintained for at a minimum of six years, a reasonable jury could, though need not, find that Williams intentionally concealed or destroyed same. As such, the Court shall deny both Albrecht and Williams' motions for summary judgment with respect to Albrecht's fraudulent concealment claim as it pertains to the missing G-86 Wing Officer's Traffic Logs.

### D.    The Prison Litigation Reform Act

Pursuant to the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. 1997e(e), "[n]o federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury." As such, Williams and Stise argue that Albrecht's "claims for damages must be dismissed" because Albrecht "does not allege any physical injury resulting from the complained of actions" and "[t]he clear language of the PLRA precludes his recovery of any mental and emotional damages." (Def.'s Opp'n Br. at 34).

51

Albrecht, however argues that "[t]he limits placed on recovery for mental and emotional injuries under the . . . PLRA . . . are limited to plaintiff's federal claims." (Pl.'s Reply at 26). Specifically, Albrecht contends that "[t]he PLRA does not contain any preemption language and defendants have failed to cite any decision which would indicate that Congress intended to preempt the remedies available for recovery of mental and emotion[al] injury on plaintiff's state-law claims." (*Id.*) Further, Albrecht argues that he did suffer a physical injury as a result of Defendants' actions. Specifically, Albrecht claims to have "suffered documented physical pain, recurring gallstone attacks, nausea, and loss of appetite during the 51-day delay in receiving needed surgery to remove his infected gallbladder." (Pl.'s Br. at 23; Pl.'s L.Civ.R. 56.1 Statement at ¶ 51).

Although commenced in federal court, Albrecht's action is based on both federal and state law. Thus, while it is clear that in the absence of any physical injury, Albrecht's claims for emotional and mental damages based on Defendants' alleged violations of federal law would have to be dismissed pursuant to § 1997e(e) of the PLRA, the same cannot be said for similar claims made based upon Defendants' alleged violations of state law. Indeed, Defendants have provided this Court with no authority for the proposition that § 1997e(e) of the PLRA bars a state law claim for mental or emotional injury without a prior showing of physical injury. Further, "while some courts have interpreted [§ 1997e(e)] to apply to state law claims as well as federal claims, *see Schonarth v. Robinson*, 2008 WL 510193, at *5 (D.N.H. Feb. 22, 2008)," this Court does not believe that "that is the correct reading of the statute." *Mercado v. McCarthy*, Civil Action No. 05-12124 (GAO), 2009 WL 799465, *2 (D. Mass. March 25, 2009).

More importantly, the Court finds that Albrecht has set forth sufficient physical injury (i.e. recurring gallstone attacks, combined with nausea and loss of appetite) to seek emotional and mental damages based on certain of his federal claims.  Thus, regardless of whether they stem from Defendants' alleged violations of federal or state law, the Court shall not dismiss Albrecht's claims for compensatory damages based upon mental or emotional injury because the Court finds that sufficient evidence of physical injury exists.  In addition, the Court shall also not dismiss Albrecht's claims for any economic loss resulting from the loss of his job or his musical instruments; nor will the Court dismiss Albrecht's claims for nominal or punitive damages.  *See Allah v. Al-Hafeez*, 226 F.3d 247, 250-52 (3d Cir. 2000).

## IV.    Conclusion

For the reasons set forth above, Albrecht's Motion for Summary Judgment is DENIED, and Defendants' Cross-Motion for Summary Judgment is GRANTED in part and DENIED in part.  An appropriate Order follows.

Dated: October 13, 2009

s/Tonianne J. Bongiovanni

**HONORABLE TONIANNE J. BONGIOVANNI**
**UNITED STATES MAGISTRATE JUDGE**